## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN SCHRODER and MICHELLE SCHRODER, | ) ) | |
| *Plaintiffs*, | ) | CASE NO. 3:20-cv-1677 (OAW) |
| | ) | |
| v. | ) | |
| | ) | |
| COLUMBIA VOLUNTEER FIRE DEPARTMENT, INCORPORATED; LYNN MESSIER; and THOMAS DOYLE; | ) ) ) ) | |
| *Defendants*. | | |

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment.  ECF No. 77.  Plaintiffs John and Michelle Schroder (individually, "John" and "Michelle"; collectively, "Defendants" or the "Schroders") served as volunteer firefighters and members of Defendant Columbia Volunteer Fire Department ("Fire Department") whose President during the relevant time was Defendant Thomas Doyle.  In June 2020, Defendant Lynn Messier, another Fire Department member, complained to the Fire Department that the Schroders were verbally abusing, harassing, and intimidating her, including one incident of physical assault.   The Fire Department suspended the Schroders, held a hearing about their conduct, and expelled them.  Plaintiffs now bring the following claims: (1) unlawful expulsion in violation of Conn. Gen. Stat. § 33-1056, (2) retaliation against the exercise of free speech in violation of Conn. Gen. Stat. § 31-51q, (3) defamation, (4) defamation *per* se, and (5) tortious interference with a beneficial relationship.  The court has reviewed the motion, Defendants' opposition thereto, ECF No. 82, Plaintiff's reply in support thereof, ECF No. 83, and the record in this case.  For the reasons discussed herein, the motion is **GRANTED IN PART** and **DENIED IN PART.**

1

I.   **BACKGROUND**

Defendant Fire Department is a non-stock corporation.  Pls.' 56(a)(2) Stmt. ¶ 1, ECF No. 82-1.  According to its bylaws, the Fire Department's stated purpose is "the preservation and protection of life, limb, and property from and during fires and other emergencies as they may occur" in the Town of Columbia.  *See* Defs.' Ex. A, Bylaws at 2, ECF No. 77-6.  At all relevant times, its President was (and continues to be) Defendant Doyle.  *See* Pls.' 56(a)(2) Stmt. ¶ 4.

Any Columbia resident who obtains the requisite certifications may be eligible for Fire Department membership.  *See* Defs.' Ex. A, Bylaws at art. V § 2.  Article XII § 1 indicates members may be "eligible for remuneration as prescribed by the Executive Board" if they meet specified criteria during the fiscal year. *See id.* at art. XII § 1.  Section 2 of same states members may receive property tax abatement if they comply with the Town of Columbia's Ordinance 18-3 and submit the required data to the Fire Department's Chief by January 10 of each year.  *See id.* at art. XII § 2.

The Schroders were both Fire Department members.  *See* Pls.' 56(a)(2) Stmt. ¶¶ 6–7.  They did not have a written contract for employment and did not receive any wages. *See id.* ¶ 8–9.  When asked during his deposition whether the Fire Department gave him W-2s, John testified, "Yes, every year that I got remuneration – every year that I got tax abatement."  *See* Pls.' Ex. A, John Depo. at 208:7–21, ECF No. 82-2.  John could not recall whether he received a W-2 in 2019 or 2020.  *See id.*  Neither plaintiff submitted any documentary evidence of wages, salary, benefits, or other remuneration.

In June 2020, the Fire Department received a complaint from Defendant Messier who alleged that the Schroders had been harassing and bullying her for three years.  *See*

*id.* ¶ 12; Defs.' Doyle Decl.  ¶¶ 12–13, ECF No. 77-3.  On July 2, 2020, Defendant Doyle

e-mailed to Michelle the substance of Defendant Messier's allegations:

> 1.  I felt I have been continually bullied and harassed by both John and
> Michelle Schroder.  For over three years I have been a victim of their verbal
> abuse and also physical abuse.  I have been treated by the Schroders as if
> I could not perform my duties as an EMT.
>
> 2. I felt manipulated on emergency calls by Michelle Schroder.
>
> 3.  I was working in the lab and Michelle Schroder was working in the ED,
> there was a knock at the door, and she was looking for swabs for the lab.  I
> told her I would get them and be right back.  When I handed her the swabs,
> she yanked them with such abrupt force I heard my shoulder snap causing
> discomfort for numerous days.
>
> 4. My families [sic] and my own safety is a concern at all times.  I want to
> serve my town and perform my duties without harassment and not have to
> be nervous about what action they may take against me or my family.

Defs.' Ex. B, E-mails 7/2/20, ECF No. 77-7.  Michelle responded to the e-mail that same

day, denying all allegations.  *See id.*  The evidence indicates that Michelle forwarded

Defendant Doyle's e-mail to John. *See id.*  It is undisputed that both Plaintiffs received

notice of Defendant Messier's allegations, *see* Pls.' 56(a)(2) Stmt. ¶¶ 13–14.

On July 6, 2020, the Fire Department mailed letters to each Plaintiff informing them

of their suspensions, effective immediately.  *See* Defs.' Ex. C, Suspension Ltrs., ECF No.

77-8.  The letters stated the suspension was made pursuant to Article VII § 3 of the

bylaws, which is the provision establishing the Hearing Board composition for a

recommended expulsion.  *See id.*; *see also* Defs.' Ex. A, Bylaws at art. VII § 3.  Plaintiffs

were informed that a hearing would be scheduled for each Plaintiff on July 20, 2020, with

John's hearing taking place at 7:00 PM and Michelle's hearing taking place at 8:00 PM.

*See* Defs.' Ex. C, Suspension Ltrs.  The letter also stated, "[Y]ou have an opportunity to

be present and/or present testimony or evidence on your behalf." *See id.* Michelle's letter is stamped as certified mail, return receipt requested, but John's letter is not. *See id.*

The following week, Defendant Doyle mailed a second set of letters to Plaintiffs, informing them that the initial letters contained a clerical error. *See* Defs.' Ex. D, Clerical Error Ltrs., ECF No. 77-9. Specifically, Defendant Doyle stated, "In my July 6, 2020 memo, there was a clerical error referencing Article VII SEC. 3 instead of the proper Article VI SEC. 3 and Article VII SEC. 1 stated in your initial suspension notification." *Id.* Article VI § 3 permits Fire Department leadership to immediately suspend a member "for conduct detrimental to the Department, or for a violation of house rules," so long as the Department notifies the member within 48 hours "of the suspension, the offense(s) resulting in the suspension and the date, time and place of the hearing pertaining to said suspension," which hearing must take place within 10 to 14 days of such notification. Defs.' Ex. A, Bylaws at art. VI § 3. Article VII § 1 states that the Fire Department "Chief and/or President may recommend expulsion of any member of the Department to the Hearing Board," so long as a hearing takes place within 14 days of the notification. *Id.* at art. VII § 1. Defendant Doyle offered to postpone the hearing an additional week but requested the Schroders notify him by July 16 if they desired additional time. *See id.* Again, Michelle's letter is stamped as certified mail, return receipt requested, but John's letter is not. *See id.* Plaintiffs did not respond to this letter or otherwise request the offered extension. *See* Pls.' 56(a)(2) Stmt. ¶ 19.

The Schroders' hearings took place on July 20, 2020. *See id.* ¶ 20. Plaintiffs attended their respective hearings and were offered a chance to testify or to present evidence, but they chose not to do so. *See id.* ¶¶ 21, 28–29.

Defendant Messier submitted a declaration in which she stated she testified at "a hearing" on July 20, 2020, concerning Plaintiffs' conduct.  *See* Defs.' Decl. Messier ¶ 5, ECF No. 77-4.  Plaintiffs submitted declarations disputing that Messier testified at their hearings.  *See* Pls.' Ex. B, John Decl. ¶ 7, ECF No. 82-4; Pls.' Ex. C, Michelle Decl. ¶ 7, ECF No. 82-5.  They also declared that the evidence introduced at the hearing "consisted of signed letters from various members of the department," and that they neither were given those letters in advance, nor allowed to cross-examine any of the witnesses.  *See* Pls.' Ex. B, John Decl. ¶ 8; Pls.' Ex. C, Michelle Decl. ¶ 8.

Once Michelle's hearing concluded, she told the Hearing Board they were "a disgrace to the institution of brotherhood," adding, "[Y]ou can all go f*** yourselves."  Pls.' 56(a)(2) Stmt. ¶ 30.

Two days later, Defendant Doyle e-mailed each Plaintiff to inform them the Fire Department would convene a special meeting on July 29, 2020, for qualified members to vote on the Hearing Board's recommendation for their expulsion.  *See id.* ¶ 31.  Defendant Doyle further stated, "I am providing you with the opportunity to submit to me, in writing, Certified Mail, by July 28, 2020 at 5 PM, any new EVIDENCE you feel that should be presented to the voting membership not heard at the Hearing Board before they make the final decision to actually effect the expulsion per the recommendation."  Defs.' Ex. E, E-mails 7/22/20, ECF No. 77-10.  The e-mails did not indicate whether Plaintiffs were invited to attend.  *See id.*

On July 29, 2020, the Fire Department held its special meeting regarding the recommendation to expel Plaintiffs from membership.  *See id.* ¶ 32.  Plaintiffs did not attend.  *See id.* ¶ 35.  The parties dispute whether Plaintiffs were allowed to attend this

meeting.  *Compare* Defs.' Doyle Decl.  ¶ 23 (declaring "Plaintiffs had an opportunity to attend and address the membership at the hearing"); *with* Pls.' Ex. B, John Decl. ¶ 10 (stating the Schroders "were not invited to the membership meeting on July 29, 2020 and were never given the opportunity to address membership directly"); Pls.' Ex. C, Michelle Decl. ¶ 10 (same).  Nineteen members voted.  *See* Pls.' 56(a)(2) Stmt. ¶ 34, 36–37.  They unanimously voted to expel Michelle, and all but one voted to expel John.  *See id.*

The Schroders deny Defendant Messier's allegations against them.  *See* Pls.' Ex. E, John Depo. at 56:22–25; Pls.' Ex. F, Michelle Depo. at 50:11–51:25.  Aside from testifying that Defendant Messier's allegations are false, they did not provide other evidence supporting the falsity.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  The court must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation

of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Instead, the party opposing summary judgment must set forth in its response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At summary judgment, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact best left for determination by a jury at trial. *Anderson*, 477 U.S. at 249.

III.   **DISCUSSION**

This case initially involved an additional Defendant, the Town of Columbia. *See* Notice of Removal, ECF No. 1. On July 19, 2022, Plaintiffs filed a Stipulation of Dismissal with prejudice only as to the Town. *See* Stip., ECF No. 56. The remaining Defendants

move for summary judgment on all five causes of action.  Plaintiffs contest all arguments. The court will address seriatim Plaintiffs' unlawful expulsion claim under § 33-1056 (Count One), free speech claim under § 31-51q (Count Two), two defamation claims (Counts Three and Four), and tortious interference with a business relationship claim (Count Five).

### A.  Conn. Gen. Stat. § 33-1056 (Count One)

Ordinarily, "courts should be reluctant to intervene in the affairs of private clubs" and other nonstock corporations.  *Sterner v. Saugatuck Harbor Yacht Club, Inc.*, 188 Conn. 531, 537 (1982).  The main exception to the general rule against court intervention "occurs when a member of a club has been … expelled in violation of the club's bylaws*.*" *Williams v. Black Rock Yacht Club*, 90 Conn. App. 27, 33 (2005), cert. denied, 276 Conn. 908 (2005).  Section 33-1056 of the Connecticut General Statutes states that expulsion of a nonstock corporation's member "shall be governed" by the bylaws "provided all such bylaws shall be reasonable, germane to the purposes of the corporation, and equally enforced as to all members."  Conn. Gen. Stat. § 33-1056(a).

Defendants argue summary judgment should be granted for two reasons.  First, they argue § 33-1056 does not permit money damages.  Summ. J. Mem. at 8, ECF No. 77-2.  Second, Defendants argue they gave Plaintiffs sufficient notice and a fair and reasonable hearing.  Plaintiffs disagree with both arguments.[1]  *See id.* at 8–11.

### 1.  *Damages*

Section 33-1056 does not expressly confer a private cause of action, let alone establish a remedy of money damages.  Under Connecticut law, the well-established principles of statutory construction require the court to "ascertain and give effect to the

---

[1] Plaintiffs do not dispute the reasonableness of the bylaws.  *See id.* at 8.

apparent intent of the legislature." *Francis v. Fonfara*, 303 Conn. 292, 297 (2012). Section 1-2z of the General Statutes of Connecticut states, "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself *and in its relationship to other statutes*." Conn. Gen. Stat. § 1-2z (emphasis added). Words must be given their "natural and usual meaning" unless context dictates otherwise. *Varley v. First Student, Inc.*, 158 Conn. App. 482, 497 (Conn. App. Ct. 2015) (quoting *Brown v. New Haven Taxicab Co.*, 92 Conn. 252, 254 (1917)). A text is ambiguous if it is "susceptible to more than one reasonable interpretation." *Francis*, 303 Conn. at 297.

In ruling that a plaintiff may bring a private cause of action for injunctive relief, the Supreme Court of Connecticut in *Sterner v. Saugatuck Harbor Yacht Club, Inc.*, cited to a related statute from the Connecticut Revised Nonstock Corporation Act ("Nonstock Corporation Act"): § 33-429. 188 Conn. at 538 (citing Conn. Gen. Stat. § 33-429; *Cross v. Midtown Club, Inc.*, 33 Conn. Sup. 150 (1976)). As a brief background, § 33-429 is the predecessor to § 33-1038, the current ultra vires provision.[2] According to § 33-1038, "the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act," Conn. Gen. Stat. § 33-1038(a), except under limited circumstances, including "a proceeding by a member … against the corporation to enjoin the act," Conn. Gen. Stat. § 33-1038(b)(1). When a member brings suit, "the court may

---

[2] Connecticut's legislature revised the Nonstock Corporation Act effective January 1, 1997, so that it would mirror its companion provisions under the Business Corporation Act. *See Connecticut Revised Nonstock Corporation Act: Hearing on H.B. 5837 Before the Joint Comm. on Judiciary*, 1996 Leg. Sess. 2499, 2530-31, 2630-31 (Conn. 1996) (statements of Conn. Sec'y of State Miles Rapoport, and Timothy Lyman and Hugh P. McGee, Jr., Comm. members of Conn. Bar Assoc. Bus. Law Section's Nonstock Corporation Act Task Force). The relevant part of § 33-429 is identical to § 33-1038. *See* CONN. OFF. OF LEGIS. RSCH., BILL ANALYSIS OF AN ACT ADOPTING THE CONNECTICUT REVISED NONSTOCK CORPORATION ACT, H.B. 5814 (1996), https://www.cga.ct.gov/ps96/ba/1996HB-05814-R00-BA.htm (stating § 33-429 would remain "substantially the same," but the revision would enable the corporation to challenge the validity of its action of an employee or agent, an issue not relevant here).

enjoin or set aside the act, if equitable and if all affected persons are parties to the proceeding, and may award damages for loss, other than anticipated profits, suffered by the corporation or another party because of the enjoining of the unauthorized act," Conn. Gen. Stat. § 33-1038(c).  In other words, through its citation to the ultra vires provision (which authorizes injunctions sought by members for a corporation's ultra vires act), the Supreme Court of Connecticut suggests this may be the source of—or at least a related provision justifying—a private cause of action when a member believes they are unlawfully expelled.

Based on the plain language of § 33-1038, it would appear that money damages are not available, at least not unless the member also seeks and obtains injunctive relief. Subsection (b)(1) states a "corporation's power to act may be challenged: (1) In a proceeding by a member against the corporation *to enjoin the act*…."  Conn. Gen. Stat. § 33-1038(b)(1).  Further, the statute authorizes courts to "award damages for loss . . . suffered *by the corporation* or another party *because of the enjoining* of the unauthorized act."  Conn. Gen. Stat. § 33-1038(c) (emphasis added).  In this sense, the legislature appears to contemplate money damages as a remedy *for corporations* or for others who suffer a loss as a result of the *court's* injunction against an unauthorized expulsion or act, and *not* to otherwise permit an award of money damages as a remedy available to the *member* (for the *corporation's* ultra vires action itself).  The legislature could have chosen to authorize a member to enjoin the act *or* to seek money damages, but it did not do so. *See generally Gerardi v. City of Bridgeport*, 294 Conn. 461, 472 (2010) (explaining the legislature "easily could have added language" to establish a civil remedy if so intended).

To the extent that, in spite of this clear statutory framework, Plaintiffs allege that

"Connecticut courts have allowed individuals who were wrongfully expelled from nonstock corporations to sue for both equitable relief and [for] monetary damages," Opp'n at 7, this assertion is unavailing, for not one of the three cases they cite addresses money damages or otherwise supports their position.  In contrast, Defendants' Reply at pages 1 and 2 of ECF No. 83 succinctly and persuasively dispenses with Plaintiffs' argument.

Plaintiffs' first case, *Williams v. Black Rock Yacht Club, Inc.*, 90 Conn. App. 27 (2005), involved probationary members of a social club who were denied full membership, *id.* at 29, and who "sought injunctive relief and a declaratory judgment," *id.* at 32.  To start, the facts are distinct, because *Williams* was "not *an expulsion case*, but rather *exclusion from membership*," which the court found to be a "critical distinction."  *Id.* at 34 (emphasis in original).  While it is true that *Williams* references money damages, it only does so as a passing reference in a lengthy quote about membership admission.[3]  *Id.*  Either way, *Williams* certainly did not involve money damages.

Plaintiffs next reference *Sterner* (which it used as a parenthetical citation for *Williams*), a case wherein the plaintiff sought reinstatement as a member of the Saugatuck Harbor Yacht Club after his expulsion therefrom, and the court found him "entitled to injunctive relief."  188 Conn. at 533.  *Sterner* is silent as to money damages save for the second concurrence to the majority opinion, which states, "Where an expelled

---

[3] The lengthy quote comes from *Trautwein v. Harbourt*, 40 N.J. Super. 247 (1956).  This New Jersey state case is no more persuasive (or binding upon this court) for several reasons, namely, in that it interpreted New Jersey law (without presenting any statutory language that would allow this court to consider its comparability to § 33-1038); found "no legal wrong," *id.* at 269, in assessing liability for allegedly "malicious *exclusion* from membership in a fraternal organization," *id.* at 268 (emphasis added); and determined that **"there are no adjudicated cases which can be regarded as square holdings as to the existence of a right of action for damages for wrongful exclusion from a purely social or fraternal organization,"** *id.* at 260 (emphasis added).  In fact, "the only decided case" that the New Jersey court found to even approach its review of an *exclusion* claim for damages was a case from 1904 out of the State of Texas, *Grand Lodge Order Hermann's Sons of Texas v. Schuetze*, 36 Tex. Civ. App. 539 (1904).

member 'can show improper treatment, the courts can and will grant damages or even order his reinstatement.'"   *Id.* at 540 (quoting Oleck, Non-Profit Corporations and Associations (1956) § 24).   The concurrence offers no additional support or explanation about money damages.   Further, the majority did not incorporate this language into the decision, and so it is not binding jurisprudence.

Plaintiffs finally turn the court's attention to *De Simone v. Stonington Harbor Yacht Club, Inc.*, No. CV176070866S, 2018 WL 5794549 (Conn. Super. Ct. Oct. 19, 2018) (Hon. Robin L. Wilson, J.).   Yet again, they drop us on the shores of another distinguishable case.   Plaintiffs assert that *De Simone* is an "action for [monetary] damages," Opp'n at 8, but without any direct (or even indirect) indication from the unpublished opinion itself. Indeed, *De Simone* involved a plaintiff who sought "to restore his status as an active member of [the yacht club]," *id.* at *1, without any explicit mention of money damages.

After dispensing with Plaintiffs' claim that money damages are an available remedy in this case, and within the guidance of clear statutory law, Defendants offer the reminder that there is "no Connecticut case which has held that money damages are available for transgressions under § 33-1056."   *Foss v. Nadeau*, No. X07CV030081658S, 2003 WL 22853695 at *2 (Conn. Super. Ct. Nov. 14, 2003) (Hon. Samuel J. Sferrazza, J.).

Still, just as "courts should be reluctant to intervene in the affairs of private clubs," *Sterner*, 188 Conn. at 537, this court need not and will not muddy the waters of state statutory interpretation, particularly where the statute appears to be clear, and where, even if the court misunderstands it, summary judgment is warranted on additional grounds, as will be explained below.   To the extent that there is an available (or at least an arguable) cause of action for money damages pursuant to § 33-1056, it is left to the

state courts and legislature to clarify. *See Johnson v. Manson*, 196 Conn. 309, 319 (1985) ("Connecticut is the final arbiter of its own laws."); *see generally State v. White*, 215 Conn. App. 273, 300 (Conn. App. Ct. 2022) ("Ultimately, in the absence of a potential conflict with the United States constitution or other federal law, our Supreme Court, and not the United States Supreme Court, is the ultimate authority on the interpretation and construction of Connecticut's statutes.").

### 2. *Fairness*

When a member challenges their expulsion on the grounds the bylaws were unreasonably applied—as is the case here—Connecticut jurisprudence "adopts common law standards of fair play and forms the basis for bylaws to be challenged by a member where they are not reasonable." *Sterner*, 188 Conn. at 535. To satisfy the common law "fair play" standard, a defendant is "required only to make a good faith effort to apply its rules equally." *Williams*, 90 Conn. App. at 39. A member facing expulsion is entitled to "a hearing that is meaningful and a sanction that is reasonable…." *Sterner*, 188 Conn. at 535. Meaning, a member "is entitled to notice of the charges against [them], notice of the time and place of the hearing and a full and fair opportunity to be present and to offer a defense." *Id.* at 33 (citing *Gervasi v. Societa Giusippi Garibaldi*, 96 Conn. 50, 57 (1921)). A "more stringent requirement would place an undue burden on such [nonstock corporations], resulting in every accidental noncompliance with the bylaws constituting a statutory violation." *Id.*

Plaintiffs first argue that the Fire Department failed to comply with its bylaws' notice requirement, because it sent notice through standard mail and e-mail rather than through certified mail, return receipt requested. *See* Opp'n at 9. It is true that the bylaws require

that the Fire Department send written notification by certified, return receipt mail of the suspension and recommendation for expulsion. *See* Def. Ex. A, Bylaws at art. VI § 3, art. VII § 1. The evidence shows that Defendants failed to strictly comply with the bylaws insofar as they did not use the certified mail process for John's hearing notification, and they e-mailed Plaintiffs about the special meeting to vote on Plaintiffs' expulsion. *See* Defs.' Ex. C, Suspension Ltrs.; Defs.' Ex. D, Clerical Error Ltrs.; Defs.' Ex. E, E-mails 7/22/20. Nonetheless, it is undisputed that Plaintiff received notice of the time and place of the hearings, and that Plaintiffs attended the hearings on July 20, 2020. *See* Pls.' 56(a)(2) Stmt. ¶¶ 14–21. The bylaws do not give members the right to receive notice before the special meeting. *See* Defs.' Ex. A, Bylaws at art. VII. Plaintiffs have presented no evidence that they were treated differently than other members, or that Defendants acted with bad faith in failing to strictly adhere to the bylaw's notification requirement. *See* *Williams*, 90 Conn. App. at 40 (stating a plaintiff must present "some evidence of an intent by the members to treat them differently from other candidates" to show the bylaws were applied unequally). Indeed, Defendants use of e-mail is a more immediate form of notification and one that facilitates back-and-forth communication. Without more, standard mail and the use of e-mail is more akin to an "accidental noncompliance" rather than bad faith. *Id.* at 39. The court concludes that Defendant's failure to strictly adhere to its notice requirement did not violate the common law standards of "fair play."

Second, Plaintiffs argue that that Defendants failed to "specify the actual violation" warranting suspension. *See* Opp'n at 9. As with the previous notice issue, Plaintiffs are correct that Defendants did not strictly comply with Article VI § 3, but this does not mean Defendants failed to notify them of the charges against them. *See Williams*, 90 Conn.

App. at 33.   The section states: "No later than 48 hours after the suspension, the suspended member shall be sent written notification … of the suspension, the offense(s) resulting in the suspension and the date, time and place of the hearing pertaining to said suspension."   *See* Ex. A, Bylaws art. VI § 3.   The record indicates that Defendant Doyle e-mailed Michelle on July 2, 2020, informing her about Messier's allegations of verbal abuse, physical abuse, and harassment.   *See* Defs.' Ex. B, E-mails 7/2/20.   Michelle forwarded the e-mail to John that day.   *See id.*   On July 6, 2020, Plaintiffs were suspended effective immediately pursuant to Article VII § 1 (an unrelated expulsion provision), and a hearing was scheduled for July 20 to determine whether suspension was warranted.   *See* Defs.' Ex. C, Suspension Ltrs.

Less than one week later, Plaintiffs received a letter from Defendant Doyle indicating that "there was a clerical error referencing Article VII SEC. 3 instead of the proper Article VI SEC. 3 and Article VII SEC. 1…."   Defs.' Ex. D, Clerical Error Ltrs.   In other words, this letter provided them notice that the hearing would be held regarding their suspension for "conduct detrimental to the Department, or for a violation of the house rules" (Article VII § 3) and the Fire Department leadership's expulsion recommendation (Article VII § 1).   *Id.*; Pls.' 56(a)(2) Stmt. ¶ 13.   Defendant Doyle offered to delay the hearing by one week to give Plaintiffs additional time to prepare.   *See id.*   Plaintiffs did not respond.   *See* Doyle Decl. ¶ 17.   The bylaws do not prevent a suspension hearing and expulsion hearing from occurring simultaneously; doing so is efficient under these circumstances, because the evidence would have been the same and Plaintiffs were given an opportunity to provide additional evidence.   *See* Defs.' Ex. E, E-mails 7/22/20. Because Plaintiffs were notified of Messier's allegations (albeit in an e-mail before the

suspension letter), because Defendants corrected the clerical error, and because Plaintiffs attended their hearings, the court concludes Plaintiffs fail to show Defendants acted in "bad faith" or that they otherwise violated notions of "fair play." *Williams*, 90 Conn. App. at 33, 39; *see also Sterner*, 188 Conn. at 535; *Gervasi v. Societa Giuseppi Garibaldi*, 96 Conn. 50, 112 A. 693, 696 (1921) ("The plaintiff's presence at the meeting, without protest as to the procedure taken, was a waiver of his right to notice of the subject discussed and acted upon at the meeting.").

Third, Plaintiffs dispute their conduct warrants immediate suspension insofar as it does not constitute "conduct detrimental to the Department or violation of the house rules." *See* Opp'n at 9. They argue that Messier's allegations stem from "conduct outside of the Plaintiffs' performance of Department duties and outside of the Department and house." *Id.* As an initial matter, the bylaws permit immediate suspension. *See* Defs.' Ex. A, Bylaws at art. VI § 3. In addition, nothing in the bylaws requires that the conduct warranting suspension happen at work. To the extent Plaintiffs disagreed their conduct was "detrimental to the Department" or a "violation of the house rules," the purpose of the hearing was to give them the opportunity to challenge Defendant's initial suspension determination. Accordingly, this argument is unavailing.

Fourth, Plaintiffs argue they were denied the opportunity to receive evidence before the hearing, which prevented them from adequately preparing their defense. *See* Opp'n at 9–10. The right to a *reasonable* expulsion hearing does not mean that a plaintiff is entitled to the panoply of due process procedures guaranteed by the constitution. *See Gervasi*,112 A. at 696 (stating that an action against a private organization "is not to be determined by close adherence to the forms of legal procedure;" rather "[i]t is enough if

those essentials and that procedure are required which are fair and make for justice rather than for form"); *Williams*, 90 Conn. App. at 37 (explaining nonstock corporation membership is a "privilege which may be accorded or withheld, and not a right which can be gained independently and then enforced") (quoting 6 Am. Jur. 2d 406–07, Associations and Clubs § 18 (1999)); *Davenport v. Society of Cincinnati in State of Connecticut*, 46 Conn. Supp. 411, 441 (Conn. Super. Ct. 1999) (Hon. Douglas S. Lavine, J.) (noting that a defendant organization's legal duties "arise from the common law rather than from the Constitution").  Plaintiffs have not provided any evidence or legal authority supporting their right to receive evidence in advance of the hearing, or to cross-examine witnesses. *See* Defs.' Ex. A, Bylaws at art. VI § 3 (providing the hearing board will "assess evidence in the form of testimony and or documentation" but not requiring advance notice). "Requiring procedures equivalent to those necessary for trials would convert expulsion hearings into full-fledged adversary proceedings interfering with a private society's fundamental right to manage its own affairs." *Davenport*, 46 Conn. Supp. at 441.  Indeed, the bylaws permitted Plaintiffs to present witness testimony and documentation, but Plaintiffs chose not to do so—even after the hearing, they were given the opportunity but elected not to supplement the record. *See* Defs.' Ex. A, Bylaws at art. VI § 4; Pls.' 56(a)(2) Stmt. ¶ 29; Defs.' Ex. E, E-mails 7/22/20.  Absent persuasive authority, the court concludes Plaintiffs were not deprived a fair hearing even though they did not receive evidence in advance.

Fifth, Plaintiffs argue that Defendant Messier did not testify at their hearings, at all. Curiously, Defendants do not directly address this issue within their Reply, though they counter that there is no requirement that witnesses be subject to cross-examination at

such a hearing.  *See* Defs.' Reply at 4.  Still, this dispute is inconsequential, as Plaintiffs challenge the procedural fairness of the hearing and not the sufficiency of the evidence. *See* Pls.' 56(a)(2) Stmt. ¶ 22 (conceding that "evidence was presented in support of the recommendation to expel Plaintiffs from the CVFD").

Lastly, Plaintiffs argue they did not receive notification of their right (or an invitation) to attend their expulsion hearing.  As previously mentioned, the undisputed evidence establishes that Plaintiffs were notified on July 12, 2020, that the hearing scheduled for July 20 concerned the recommendation for expulsion as well as their suspension.  Defs.' Ex. D, Clerical Error Ltrs. (citing Bylaw Art. VII § 1).  Plaintiffs attended their hearings. *See* Pls.' 56(a)(2) Stmt. ¶ 21.  The bylaws do not permit a member to attend the special meeting to determine expulsion.  *See* Defs.' Ex. A, Bylaws at art. VII § 6.  Therefore, it is not a violation of the bylaws that the Fire Department informed Plaintiffs via e-mail that members would be voting on their expulsion on July 29, 2020 (before which they were given an opportunity to submit additional evidence but chose not to do so).

For the above reasons, summary judgment is **GRANTED** as to Count One.

### B.  Conn. Gen. Stat. § 31-51q (Count Two)

Section 31-51q of the General Statutes of Connecticut prohibits "any employer, including the state and any instrumentality or political subdivision thereof, who subjects or threatens to subject any employee to discipline or discharge on account of" the employee exercising their free speech rights under the First Amendment of the United States Constitution or § 4 of the first article of the Connecticut Constitution, "provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer."

Conn. Gen. Stat. § 31-51q(b)(1).  For a plaintiff to have standing to sue under § 31-51q, an employer-employee relationship must exist.  *See Varley*, 158 Conn. App. at 496.

Defendants' sole argument is that the Fire Department was not Plaintiffs' employer. Specifically, Plaintiffs did not receive salaries or other wages, and so they were simply volunteers.  Plaintiffs disagree, arguing that they received remuneration in the form of a tax exemption.  The parties dispute whether there is evidence of remuneration.

Section 31-51q does not define "employer."  "Generally, when a statutory term is not defined, we presume that it was intended to have its ordinary meaning as expressed in standard dictionaries."  *State v. Wright*, 320 Conn. 781, 802 (2016).  The Connecticut Appellate Court evaluated what is meant by "employer" under § 31-51q in *Varley v. First Student, Incorporated*, 158 Conn. App. at 496.  The *Varley* court affirmed the trial court's use of the dictionary definition: "[o]ne who employs the services of others; one for whom employees work and who pays their wages or salaries."  *Id.* at 498.  Various dictionary definitions—which the appellate court cited as confirming the trial court's definition accurately reflected the "ordinary meaning" of employer—all require an "employer" to pay a worker's salary or wages.  *See id.* at 498–99 (citing Black's Law Dictionary (9th Ed.2009), Webster's Third New International Dictionary (2002), Random House Webster's Unabridged Dictionary (2d Ed.2001), and American Heritage Dictionary (2d College Ed.1985)).  As the *Varley* court explained, where a plaintiff does not receive "a paycheck, tax forms, health insurance or other benefits from the defendant," they cannot be considered an employee.  *See id.* at 499.

Here, it is undisputed that the Fire Department did not pay Plaintiffs wages.  *See* Pls.' 56(a)(2) Stmt. ¶ 8.  There is nothing in the record concerning Michelle's receipt of

remuneration, tax abatement, or other benefits.  John testified that he received W-2s during the years he received remuneration and/or tax abatement, but he did not provide any evidence establishing the years, if any, that he received the W-2s.  Accordingly, the record does not support a finding that either Plaintiff received "a paycheck, tax forms, health insurance or other benefits" indicative of wage or salary payment.  *Varley*, 158 Conn. App. at 499.  Given Plaintiffs' admission that they did not receive wages—and in consideration of John's vague testimony unsupported by documentary evidence along with *Varley*'s reasoning—the court concludes the Fire Department is not Plaintiffs' "employer."  *See Fletcher*, 68 F.3d at 1456 (stating a "a party may not rely on mere speculation or conjecture as to the true nature of the facts" to defeat summary judgment); *Anderson*, 477 U.S. at 243 (stating summary judgment opponent must provide "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

Ignoring *Varley* altogether, Plaintiffs argue they are "employees" pursuant to the "remuneration test," which is used by federal courts and adopted by the Supreme Court of Connecticut for Title VII and CFEPA claims.  As explained in *CHRO v. Echo Hose Ambulance*, 322 Conn. 154, 162 (2016) (*Echo Hose I*), a volunteer can be considered an "employee" for the purposes of Title VII and the CFEPA if they can pass a two-part test: (1) that they received remuneration and (2) that there existed an employment relationship under agency law.  "Remuneration may consist of either direct compensation, such as a salary or wages, or indirect benefits that are not merely incidental to the activity performed."  *See id.* at 161–62.  Indirect benefits include "health insurance, vacation, sick pay, a disability pension, survivors' benefits, group life insurance, scholarships for dependents upon death, or other indirect but significant remuneration."  *CHRO v. Echo*

*Hose Ambulance*, 156 Conn. App. 239 (Conn. App. Ct. 2015) (*Echo Hose II*).  This district used the "remuneration test" for a § 31-51q claim in *Lee v. Yale University*, 624 F. Supp. 3d 120, 141 (D. Conn. 2022), concluding that access to university libraries, research subscriptions, office space, university materials, and malpractice insurance do not constitute "indirect benefits."

For the same reasons explained above, Plaintiffs cannot establish they were "employees" under the "remuneration test" either.  Namely, Plaintiffs have not submitted any evidence established they received any remuneration the year they were expelled (or any previous year for that matter).  Therefore, the court **GRANTS** summary judgment as to Count Two on the grounds that Plaintiffs lack standing.

### C.   Defamation and Defamation *Per Se* (Counts Three and Four)

To establish the tort of defamation, a plaintiff must demonstrate: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement."  *NetScout Sys., Inc. v. Gartner, Inc.*, 334 Conn. 396, 410 (2020).   "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . ."  *Gleason v. Smolinski*, 319 Conn. 394, 431 (2015).   To be actionable, the comment must be a statement of fact, not an opinion.  *See NetScout*, 334 Conn. at 411.  In addition, the defamatory statement must be false; truth is an affirmative defense.  *Id.*

Defamatory statements are actionable *per se* when "the defamatory meaning of the speech is apparent on the face of the statement."  *Silano v. Cooney*, 189 Conn. App.

235, 242 (Conn. App. Ct. 2019).  To prove defamation *per se*, the statement "must be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached," i.e., "a chargeable offense which is punishable by imprisonment."  *Gleason*, 319 Conn. at 430 n.31.  Such a statement is *per se* defamation, because "injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need neither plead nor prove it."  *Id.*

The crux of the parties' dispute is whether Defendant Messier's statements were fact or opinion.   "It should surprise no one that the distinction between actionable statements of fact and nonactionable statements of opinion is not always easily articulated or discerned."  *NetScout*, 334 Conn. at 411.  This is largely because an opinion sometimes can "imply the existence of an underlying basis in an unstated fact or set of facts."  *Id.* at 411–12.  The court must assess, as a matter of law, whether the person intends to assert an objective fact or comment on the facts stated.  *See id.* at 412, 417. Therefore, the court must assess context: "(1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification."  *Id.* at 414.   Where an assertion is ambiguous, the jury must decide as a question of fact whether the statement is "reasonably capable of a defamatory meaning."  *Id.* at 417–18.  "Each statement furnishes a separate cause of action and requires proof of each of the elements for defamation." *Gleason*, 319 Conn. at 431.

Defendants argue that Defendant Messier's allegations against Plaintiffs are either nonactionable expressions of opinion, or true.  *See* Summ. J. Mem. at 14–19.  Plaintiffs concede that some of Defendant Messier's allegations—"namely that she was fearful of the Plaintiffs"—were expressions of opinions.  Opp'n at 16.  Plaintiffs argue that other allegations were statements of fact, though they only specifically mention in their brief Defendant Messier's claim that Michelle yanked swabs out of her hand.  *See* Opp'n at 16–17.

The parties did not submit Defendant Messier's initial written complaint into evidence.  It is undisputed that, on July 2, 2020, Defendant Doyle e-mailed Plaintiffs, informing them that Defendant Messier had submitted a written complaint against them.  *See* Pls.' 56(a)(2) Stmt. ¶ 13.  The record contains the e-mail to Michelle, but not to John.

### 1. *Michelle*

Defendant Doyle's e-mail to Michelle indicated that Plaintiffs' "behavior has caused [Defendant Messier] to feel harassed, unsafe, intimidated, uncomfortable, and has created a hostile environment."  Defs.' Ex. B, E-mails 7/2/20.  Defendant Doyle listed four allegations:

> 1. I felt I have been continually bullied and harassed by both John and Michelle Schroder. For over three years I have been a victim of their verbal abuse and also physical abuse. I have been treated by the Schroders as if I could not perform my duties as an EMT.

> 2. I felt manipulated on emergency calls by Michelle Schroder.

> 3. I was working in the lab and Michelle Schroder was working in the ED, there was a knock at the door, and she was looking for swabs for the lab. I told her I would get them and be right back. When I handed her the swabs, she yanked them with such abrupt force I heard my shoulder snap causing discomfort for numerous days.

4. My families [sic] and my own safety is a concern at all times. I want to serve my town and perform my duties without harassment and not have to be nervous about what action they may take against me or my family.

*Id.*  Michelle disputed the veracity of the first and third allegation.  With respect to the second, she stated, "I can't attest to this statement because I don't understand the assertion," adding she felt "harassed" by the statement.  *Id.*  As for the fourth, Michelle stated she felt threatened and harassed "[d]ue to this fictitious complaint," and she expressed a desire not to participate in Fire Department meetings with Defendant Messier present.  *Id.*

As an initial matter, Plaintiffs do not challenge the veracity of the second allegation, and they do nothing more than describe the fourth allegation as "fictitious."  *See* Defs.' Ex. B, E-mails 7/2/20.  Regardless, these allegations (even within context) clearly are "expressions of opinion," as they describe Defendant Messier's own feelings about manipulation and safety, albeit through facts neither stated nor explained.  *See NetScout*, 334 Conn. at 412, 414.

The first and third allegations initially may appear more difficult to discern, but after careful review, the court finds that neither one is actionable as a matter of law, though each for a different reason.  The first allegation is determined by its context, in that it relates to a written complaint, which led to an investigation of the underlying conduct that was reported.  Therefore, the circumstances would not tend to lead an audience to expect that the allegations themselves have objective meaning.  *See NetScout*, 334 Conn. at 414.  Second, the "nature and tenor" of Defendant Messier's allegations suggest she made an evaluative opinion: she states she "felt … bullied and harassed," described herself as a "victim of their verbal and also physical abuse," and claimed to be "treated … as if" she was incapable of performing her EMT duties.  The import of her allegation is

24

her opinion about the facts, not the facts themselves.   Third, harassment, bullying, victimization, and abuse are not statements of facts subject to objective verification—they are descriptions of an experience that derive from a sequence of unstated facts (of which there is no evidence of their falsity).   Accordingly, when placed into context, the first allegation constitutes a nonactionable opinion.

The third allegation is slightly more nuanced.   Michelle testified that the incidents "didn't happen in the way that she claims."   Pls.' Ex. F, Michelle Depo. at 50:12–17, ECF No. 82-8.   According to Michelle, she went to the lab, rang the doorbell, and asked for the items she needed.   *See* Pls.' Ex. I, Michelle Depo. at 52:12–19.   Defendant Messier left, returned, "provided them," and Michelle "took them from her," thanked her, and returned to her job.   *Id.*   Michelle testified that Defendant Messier "fabricated a hundred percent of the – *in the way* that I took them away from her."   *Id.* (emphasis added).   Michelle does not appear to challenge whether Defendant Messier suffered an injury from the interaction.   In other words, according to Plaintiffs, the false statements are that Defendant Messier said Michelle "yanked" the swabs with "abrupt force."   Defs.' Ex. B, E-mails 7/2/20.   The court finds these particular descriptions are not "precise" but are instead "loose, figurative or hyperbolic;" meaning, they reflect Defendant Messier's subjective experience of the incident and are not objectively verifiable.   *NetScout*, 334 Conn. at 413–14 (citing *Mr. Chow of New York v. St. Jour. Azur S.A.*, 759 F.2d 219, 226 (2d Cir. 1985)); *Indiaweekly*, 596 F. Supp. 2d at 504 (explaining that both Connecticut and New York law, the latter on which *Mr. Chow* is based, "adopted the Restatement to define the dichotomy between an assertion of fact and a statement of opinion").   Therefore, they are nonactionable opinions.

Alternatively, Defendants have established a defense to this defamation claim as a matter of law.  "Contrary to the common law rule that required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial proof need be shown to constitute the justification."  *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 112–13 (1982); *Gerrish v. Hammick*, 198 Conn. App. 816, 831 (Conn. App. Ct. 2020) ("Importantly, if a defendant moves for summary judgment on a defamation count and there exists no genuine issue of material of fact as to whether the alleged defamatory statement is substantially true, then it is appropriate for the trial court to enter summary judgment in favor of the defendant.").  Because Michelle's testimony reveals that the only allegedly false aspect of the third allegation is "the way" Michelle took the swabs, the court concludes it is substantially true.  Accordingly, summary judgment is **GRANTED** as to Michelle's defamation and defamation *per se* claims.

### 2.  *John*

Unlike Michelle, the parties did not submit Defendant Doyle's e-mail to John. Based on the court's reading of paragraph 14 of the Second Amended Complaint, ECF No. 72, the citation to the e-mail in paragraph 13 of the Defendants' 56(a)(1) Statement, and a representation from Defendants in their summary judgment motion, *see* Summ. J. Mem. at 3 (noting that "copies of the July 2. [sic] 2020, e-mails to/from Thomas Doyle and Plaintiffs are attached to the Doyle Decl. as Exhibit B"), the court surmises the parties have this document in their possession, but that Defendants failed to present it for the court's review.[4]

---

[4] To the extent Defendant Messier lodged the same allegations against John as she did against Michelle, the court finds John's defamation claims fail *as to these allegations* for the same reasons discussed for Michelle.

Despite having failed to submit the documents into evidence, Defendants appear to concede that Defendant Messier made additional allegations against John: (1) that he "made obscene gestures toward [her] using his middle finger;" and (2) that, occasionally, "he would follow [her] all the way home." *Id.*  In assessing context, two out of three factors weigh in favor of finding these allegations are statements of fact, not opinion.  The first factor—whether the circumstances would cause the audience to expect an evaluative or objective meaning—applies equally to John as they do to Michelle, and for the above reasons they do not weigh in favor of "objective meaning."  *See NetScout*, 334 Conn. at 414.  However, the second and third factors weigh heavily in favor of a conclusion that these particular allegations are statements of fact.  With respect to the second factor (whether the "nature and tenor" of the language indicates an "evaluative opinion or objective fact"), Defendant Messier's allegations about Plaintiffs' *conduct* suggest an "objective fact": that he used his middle finger towards her while driving by on multiple occasions, and that he followed her home from work on more than one occasion.  *See NetScout*, 334 Conn. at 414.  As for the third factor, the above statements could be "subject to objective verification," insofar as other eye witnesses could corroborate Defendant Messier's allegations or John's denial that they took place.  Because these two allegations either happened (or they didn't) and do not suggest Defendant Messier's evaluative opinion, the court concludes these particular allegations constituted statements of fact.[5]

---

[5] Should Defendants believe Defendant Messier's reference to an "*obscene* gesture" is an expression of opinion, statements that are ambiguous are also issues for the jury to decide.  *See NetScout*, 334 Conn. at 414.

### i.   *Defamation*

Having concluded that these two allegations are statements of fact, the court also finds summary judgment must be denied as to Count Three.  For purposes of summary judgment, Defendants do not challenge any other element of John's defamation claim, and the record establishes John satisfies the requisite elements.  *See NetScout*, 334 Conn. at 410.  Defendant Messier published her statements to Defendant Doyle and identified John in her accusations.  *See* Defs.' Ex. B, E-mails 7/2/20.  During his deposition, John appears to have been shown the content of Defendant Doyle's e-mail, and when asked whether he "dispute[s] the truth of … Lynn Messier's allegations against [him] and Michelle Schroder," he testified, "Absolutely," *see* Pls.' Ex. F, John Depo. at 56:18–25, explaining that they simply were untrue in their entirety, *id.* at 57:1–5.  He also testified that he had lived in the town his entire life, that his parents still live in the town, that he had been in good standing with the Fire Department for 36 years, and that he felt embarrassed by the false accusations.  *See* Pls.' Ex. E, John Depo. at 57:6–25.  Given the severity of the allegations against him and his longstanding family history in a relatively small town, the court finds a reasonable jury could conclude Defendant Messier's allegations against him harmed his reputation in his community.  *See Gleason*, 319 Conn. at 431.  Accordingly, the disputes as to material facts are best left to a jury for determination, and thus survive summary judgment.  Count Three is **DENIED** as to the two allegations described above.

### ii.   *Defamation* Per Se

Turning to Count Four—John's defamation *per se* claim—the court notes that neither party has provided any legal authority establishing *or* refuting whether Defendant

Messier's two allegations constitute crimes of moral turpitude and/or crimes punishable by imprisonment. Defendants argue, "The statements at issue never use the term 'stalking' or 'assault.'" Summ. J. Mem. at 18. In other words, Defendants would have the court conclude the plaintiff must show the alleged defamer used the specific legal terms of the crime. But Defendants have not provided the court with legal authority supporting their position. Connecticut jurisprudence requires only that the allegations describe conduct that could, if true, constitute a crime. *See, e.g., Silano v. Cooney*, 189 Conn. App. 235, 243 (Conn. App. Ct. 2019) ("clarify[ing] our definition of defamation per se vis-à-vis *imputations* of criminal conduct); *Karlen, Gerard v. Saleeb, Hany*, No. FST CV 21-5025649S, 2024 WL 445897, at *4 (Conn. Super. Ct. Feb. 1, 2024) (denying motion to strike where allegations "*essentially* accused plaintiffs of the crime of theft of services" and "allegations incorporated from [plaintiff's] wife's complaint *describe* stalking and harassing conduct") (Hon. Edward T. Krumeich II, J.T.R.). From there, "[w]hether a statement constitutes defamation *per se* 'is a question for the court.'" *Kalashnikov v. Myfield Lane Homeowners' Ass'n, Inc.*, No. 3:20cv1018(MPS), 2023 WL 1862763, at *18 (D. Conn. Feb. 9, 2023) (quoting *Battista v. United Illuminating Co.*, 10 Conn. App. 486, 492 (Conn. App. Ct. 1987).

In Connecticut, both felonies and misdemeanors are punishable by a term of imprisonment. *See* Conn. Gen. Stat. § 53a-25 ("An offense for which a person may be sentenced to a term of imprisonment in excess of one year is a felony."); Conn. Gen. Stat. § 53a-26 (defining misdemeanor classes A through D as crimes punishable by a maximum term of 1 year, 6 months, 3 months, and 30 days, respectively). Threatening, stalking, and harassing are all crimes punishable by a term of imprisonment. *See* Conn.

Gen. Stat. §§ 53a-61aa and 53a-62 (threatening); §§ 53a-181c through 53a-181e (stalking); §§ 53a-182b & 53a-183 (harassment).

The court first addresses Defendant Messier's allegation that John "made obscene gestures toward [her] using his middle finger." "The Supreme Court of Connecticut has found that to be actionable as a threat, a statement must explicitly threaten violence." *Silano v. Scarnuly-Grasso*, No. 3:12-cv-1732 (JBA), 2017 WL 2802875 (D. Conn. June 28, 2017) (citing *State v. Krijger*, 313 Conn. 434, 452 (2014)). A threat must be sufficiently violent under an objective standard: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . ." *Krijger*, 313 Conn. at 450. Simply giving the middle finger cannot, without more, reasonably constitute an intent to harm or assault. If this were the case, innumerable drivers with road rage would be arrested. After assessing the stalking and harassment statutes, the court also concludes Defendant Messier's first allegation, standing alone, could not satisfy those statutes as a matter of law.

Defendant Messier's second allegation—that John would "follow [her] all the way home" after her work shift—yields a different outcome. "A person is guilty of stalking in the third degree when such person recklessly causes another person to reasonably (1) fear for his or her physical safety, or (2) suffer emotional distress, as defined in section 53a-181d, by wilfully and repeatedly following or lying in wait for such other person." Conn. Gen. Stat. § 53a-181e. Defendant Messier claimed to be afraid for her physical safety. *See* Defs.' Ex. B, E-mails 7/2/20. Accordingly, her accusations could have led to a charge of third degree stalking, a crime punishable by imprisonment. Absent

persuasive legal authority to the contrary, this court concludes John has established defamation *per se* as to this specific statement  and summary judgment is **DENIED** as to Count Four.

### D. <u>Tortious Interference with a Beneficial Relationship (Count Five)</u>

To establish a claim for tortious interference with a contractual or beneficial relationship, a plaintiff must plead and ultimately prove: "(1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." *Solon v. Slater*, 345 Conn. 795, 812–13 (2023) (quoting *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 212–13 (2000)).   An interference is tortious only if it involves "improper motive or improper means."   *Id.* at 813.   Conduct that satisfies this standard includes "fraud, misrepresentation, intimidation" or a malicious act.  *Id.*  A plaintiff must prove they suffered "actual loss" resulting from the interference.

It is undisputed that Plaintiffs did not have a written contract with the Fire Department.   *See* Pls.' 56(a)(2) Stmt. ¶ 9.   Plaintiffs instead argue that they had a "beneficial relationship" with the Fire Department because they served the corporation for several years and "received benefits as part of their service."  Opp'n at 18.  Plaintiffs do not provide any legal authority supporting their position.

The law protects beneficial relationships insofar as "it also forbids unjustifiable interference with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry. *Wellington Sys., Inc. v. Redding Grp., Inc.*, 49 Conn. App. 152, 167 (Conn. App. Ct. 1998).  It has long been held that the tort protects

"[f]ull, fair, and free competition" as a "necessary to the economic life of a community." *Skene v. Carayanis*, 103 Conn. 708, 131 A. 497, 498 (1926).  In other words, whether the relationship is based on a contract or another type of relationship, it must necessarily be rooted in some sort of economic relationship.  *See id.*; *see generally Curcio v. Hartford Fin. Servs. Grp.*, 472 F. Supp. 2d 239, 246–47 (D. Conn. 2007) (acknowledging that an employer-employee relationship constitutes a "beneficial relationship" for the purposes of this tort); *Walsh v. Long ex rel. St. Francis Care*, No. CV020815945S, 2002 WL 31875302, at *1 (Conn. Super. Ct. Nov. 26, 2002) (Hon. Richard M. Rittenband, JTR) (same).  As explained above, Plaintiffs failed to submit any evidence of remuneration by the Fire Department, and absent such evidence the relationship is more akin to a social relationship rather than an economically beneficial relationship.  Having failed to provide legal authority that Plaintiffs' particular relationship is "beneficial" under well-established precedent, this court concludes that Plaintiffs fail to establish the first element.

Assuming a beneficial relationship existed, Plaintiffs did not cite any legal authority or evidence establishing the other elements.  The court will not go so far as to assume Defendant Messier's complaint was made with "improper motive or improper means" simply because Plaintiffs disagree with the contents.  Furthermore, Plaintiffs have failed to submit any evidence establishing "actual loss" from their expulsion.  Therefore, the court **GRANTS** summary judgment as to Count Five.

## IV.   <u>CONCLUSION</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Summary Judgment is **GRANTED** as to Counts One, Two, and Five.

2. Summary Judgment is **GRANTED** as to Counts Three and Four brought by Michelle.

3. Summary Judgment is **DENIED** as to Count Three brought by John with respect to Defendant Messier's two allegations, listed as allegations (1) and (3) on page 3 of Defendants' Memorandum in support of Summary Judgment (regarding the obscene middle finger gestures, and following Messier home).  *See* ECF No. 77-2 at 3.  Summary Judgment is **GRANTED** for all other allegations made by Defendant Messier.

4. Summary Judgment is **DENIED** as to Count Four brought by John with respect to Defendant Messier's allegation listed as (3) on page 3 of Defendants' Memorandum in support of Summary Judgment.  *See* ECF No. 77-2 at 3.  Summary Judgment is **GRANTED** for all other allegations made by Defendant Messier.

5. Counts Three and Four—as to John Schroder only—are ready to proceed to trial. Within 24 days of this ruling, Plaintiff John Schroder and Defendant Lynn Messier shall e-file a joint status report indicating:

   a. The estimated length of trial;

   b. Whether the parties would like to resume their settlement conference with Judge Richardson; and

   c. Whether the parties consent to referral to a (different) Magistrate Judge for a bench **or jury trial** in this matter (pursuant to Local Rule 73), which might well result in trial being scheduled sooner than with the undersigned.

Thereafter, the court will issue such referral(s), or will schedule the matter for trial and will issue corresponding instructions and deadlines.

**IT IS SO ORDERED** in Hartford, Connecticut, this 30th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE